OSCN Found Document:GALBRAITH v. GALBRAITH

 

 
 

 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only

 
 
 

 
 GALBRAITH v. GALBRAITH
2024 OK 43
Case Number: 121849
Decided: 06/11/2024
THE SUPREME COURT OF THE STATE OF OKLAHOMA

Cite as: 2024 OK 43, __ P.3d __

 

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

IN THE MATTER OF:
PETER TOWNE GALBRAITH, II, Petitioner/Appellant,
v.
BELINDA GALBRAITH, Respondent/Appellee.

APPEAL FROM THE DISTRICT COURT OF TULSA COUNTY;
Honorable Mary Ann Godsby, Special Judge 
¶0 The co-guardians of an incapacitated ward filed a petition for dissolution of marriage on behalf of their ward. The trial court held generally that the guardian did not have authority to file the petition on behalf of the ward. One of the co-guardians subsequently obtained authorization from the guardianship court to file the petition and then refiled. The wife of the ward filed a motion to dismiss alleging Oklahoma law does not allow a guardian to initiate a divorce on behalf of a ward. The trial court agreed and entered a more detailed judgment specifying the caselaw and statutes it believed supported the motion to dismiss. The guardian appealed the judgment to this Court and we previously retained the matter on our own motion.

PREVIOUSLY RETAINED ON THIS COURT'S OWN MOTION; JUDGMENT OF THE TRIAL COURT REVERSED; REMANDED FOR FURTHER PROCEEDINGS
James R. Gotwals, Mary L. Gutierrez, and John C. Gotwals, Barrow & Grimm, P.C., Tulsa, Oklahoma for Petitioner/Appellant
Emalie L. Foster, McAfee & Taft, P.C., Tulsa, Oklahoma for Respondent/Appellee

COMBS, J.:
¶1 This matter involves the issue of whether a guardian can initiate a divorce proceeding on behalf of an incapacitated ward. The guardian filed a Petition for Dissolution of Marriage in Tulsa County, Oklahoma seeking to dissolve the marriage of an incapacitated ward from his estranged wife. The district court denied the petition on the grounds that provisions of the Oklahoma Guardianship and Conservatorship Act as well as title 43 of the Oklahoma Statutes do not provide authorization for a guardian to initiate divorce proceedings on behalf of a ward. Its decision was also based on decisions of this Court which preceded the enactment of the Oklahoma Guardianship and Conservatorship Act, previously known as the Oklahoma Guardianship Act.
[1] We disagree.
FACTUAL AND PROCEDURAL BACKGROUND
¶2 The Petitioner, Peter Galbraith, II, (Mr. Galbraith/ward) and the Respondent, Belinda Galbraith (Mrs. Galbraith), were married on October 3, 2015, in Tulsa, Oklahoma. Prior to the marriage, the parties executed an antenuptial agreement that would terminate in ten (10) years if, (1) the parties are still married; (2) neither party is deceased; and (3) no Petition for Divorce or Petition for Separation was filed by either party prior to the date of termination of the agreement.
[2] Somewhere between 2018 to 2019 Mr. Galbraith became ill with Frontotemporal Dementia BV. Mrs. Galbraith obtained a power of attorney and in April 2022, she deeded the marital residence to her separate trust. Later that year, around August/September 2022, she advised Mr. Galbraith's brother and mother that she could no longer take care of Mr. Galbraith and asked if they could take care of him. Mr. Galbraith was moved out of the marital home soon thereafter.
¶3 In October 2022, Mr. Galbraith's brother and mother petitioned the court for a general guardianship
[3] over the person and property of Mr. Galbraith and Letters of Guardianship were filed in January 2023. In the same month, the co-guardians filed a Petition for the Dissolution of Marriage in the District Court of Tulsa County, State of Oklahoma; FD-2023-49 (first divorce action) without first obtaining authorization from the guardianship court. Mrs. Galbraith filed a motion for summary judgment alleging the guardians lacked authority to initiate a divorce proceeding on behalf of the ward. The trial court agreed and granted the motion on May 24, 2023. The journal entry of judgment stated that the co-guardians lacked the authority to initiate the divorce on behalf of the ward, Mr. Galbraith. The guardian, Mark Galbraith, thereafter filed with the guardianship court an Application for Authority to Pursue Legal Remedies Belonging to the Guardianship. He sought to obtain authority to pursue legal remedies of the ward. On July 24, 2023, the guardianship court granted authorization to pursue all legal actions. This order was amended on August 8, 2023, to clarify that the authorization included "instituting an action for a Dissolution of Marriage and obtaining a Final Decree of Dissolution of Marriage."[4] 
¶4 Upon receiving authorization from the guardianship court, Mark Galbraith filed, on August 10, 2023, a second Petition for Dissolution of Marriage and verified the petition. Thereafter, Mrs. Galbraith filed a motion to dismiss arguing there was no statutory authority allowing a guardian to instigate a dissolution of marriage just as there is no authority for a guardian to decide to whom a ward should marry. On October 31, 2023, (filed December 6, 2023) the trial court entered a journal entry of judgment granting the motion. It held that a guardian did not have the authority to initiate a divorce proceeding pursuant to Scofus v. Fuller, 1954 OK 363, 280 P.2d 720, and the post-Scofus enacted statute, 30 O.S. § 3-119, does not authorize a court to allow a guardian to initiate a divorce proceeding. As further evidence of the lack of such authority, the trial court noted that 43 O.S. § 105(C) requires the petitioner in a divorce proceeding to verify a petition for dissolution of marriage.

¶5 On December 19, 2023, Mr. Galbraith appealed the journal entry of judgment and on January 12, 2024, this Court retained the appeal on our own motion.

STANDARD OF REVIEW
¶6 An appellate court makes a de novo examination of the issues when a trial court dismisses an action. Kirby v. Jean's Plumbing Heat & Air, 2009 OK 65, ¶5, 222 P.3d 21, 23. Motions to dismiss are generally viewed with disfavor. Osage Nation v. Board of Commissioners of Osage County, 2017 OK 34, ¶22, 394 P.3d 1224, 1234 (quoting American Natural Resources, LLC v. Eagle Rock Energy Partners, L.P,, 2016 OK 67, ¶6, 374 P.3d 766, 769). When reviewing a motion to dismiss, the Court must take as true all the challenged pleading's allegations together with all reasonable inferences which may be drawn from them. Harwood v. Ardagh Grp., 2022 OK 51, ¶14, 522 P.3d 473, 477, as corrected (Sept. 19, 2022). The purpose of a motion to dismiss is to test the law that governs the claim, not the facts. MeGee v. El Patio, LLC, 2023 OK 14, ¶5, 524 P.3d 1283, 1285. Dismissal is appropriate only when there is no cognizable legal theory to support the claim or there are insufficient facts under a cognizable legal theory. Id. 
ANALYSIS
¶7 This appeal is prosecuted pursuant to Rule 1.36, Okla.Sup.Ct.R, which provides for the trial court filings to serve as the appellate briefs and the assignments of error on appeal are those listed in an appellant's petition in error. Farley v. City of Claremore, 2020 OK 30, ¶10, 465 P.3d 1213, 1221. Mrs. Galbraith asserts a guardian is not authorized to initiate a divorce proceeding on behalf of an incapacitated ward. Her arguments rely largely on Scofus v. Fuller, 1954 OK 363, 280 P.3d 720, and State ex rel. Robedeaux v. Johnson, 1966 OK 157, 418 P.3d 337. The facts and holding in Scofus are distinguishable from the present case. In Scofus, the couple was married in July 1939. Scofus, 1954 OK 363, ¶2, 280 P.3d at 722. On February 16, 1940, husband (J. D. Fuller) filed a petition for divorce alleging his Native American wife (Martha) had large deposits of money with the Department of Interior and asked for $50,000.00 in alimony. Id. ¶3, 280 P.3d at 722. Martha answered and cross-petitioned for divorce. Id. Ten days later, Fuller incurred a significant head injury. Id. ¶4, 280 P.3d at 722. In May 1940, Fuller was found to be incompetent and his father was appointed his guardian. Id. ¶5, 280 P.3d at 722. In July 1940, the divorce was tried and Fuller was granted a divorce as well as support money in the amount of $10,000.00. Id. ¶6, 280 P.3d at 722. In January 1942, Fuller was adjudicated "insane" and was committed to a hospital in Vinita, Oklahoma. Id. ¶7, 280 P.3d at 722. He was released in 1949 but was never restored to competency. Id. In the meantime, Martha remarried in 1944, some four years after the divorce. Id. ¶8, 280 P.3d at 722. Her new husband was Buster Chisholm (Chisolm). Id. Martha died on July 9, 1949, and Chisholm filed an application to probate her will. Id. However, Chisholm died just weeks later on July 21, 1949. Id. Fuller through his guardian challenged the probate and claimed he was the surviving husband of Martha. Id. ¶9, 280 P.3d at 722. His claim was denied by the County Court. Id. Later, in 1951, Fuller's guardian filed a petition to vacate the divorce decree based upon the allegation that Fuller was insane at the time the decree was entered. Id. ¶11, 280 P.3d at 722-23. The County Court agreed and found the decree was void on the face of the record and Fuller was the surviving husband and forced heir of Martha. Id. ¶12, 280 P.3d at 723. The administrator of Chisholm's estate (Harry Scofus) appealed the ruling to the District Court. Id. ¶13, 280 P.3d at 723. The District Court also held the divorce decree was void on the face of the record and vacated the decree. Id. Scofus then appealed the matter to this Court alleging the divorce was valid. Id. ¶19, 280 P.3d at 723.
¶8 We held that unless a divorce decree is void on the face of the record or judgment roll, it cannot be attacked after it has remained unchallenged for more than 10 years. Id. ¶15, 280 P.3d at 723. We acknowledged that the well-established rule requires that in order to vacate a judgment upon grounds that it is void on its face the defects must be patent on the face of the record and no outside testimony is permissible to show its invalidity. Id. ¶18, 280 P.3d at 723. If extrinsic evidence is necessary, the motion to vacate must be presented within three years following the rendition of the judgment. Id. ¶33, 280 P.3d at 725; See 12 O.S. 1951, § 1038. The divorce decree, however, was rendered more than 10 years prior to the motion to vacate and extrinsic evidence was introduced to show the decree was void. Id. ¶34, 280 P.3d at 725. The trial court that granted the divorce only found Fuller to be incompetent, not insane. Id. ¶35, 280 P.3d at 725. We held it was error for the later court to admit extrinsic evidence tending to show that Fuller had been insane prior to the decree of divorce. Id. ¶35, 280 P.3d at 726. Therefore, we reversed the decision of the trial court with directions to hold the divorce decree valid. Id. ¶36, 280 P.3d at 726.
¶9 In support of her arguments, Mrs. Galbraith relies upon language in paragraph 30 of Scofus. In paragraph 30 of the opinion, the Court stated, "We think the majority rule that an insane person may not institute or maintain a divorce action by guardian or Committee, is sound and fair." Id. ¶30, 280 P.3d at 725. The trial court correctly referred to this language as dicta because it was not necessary for the Court's holding.[5] The case was not decided on the personal nature of a divorce action but was instead decided upon the length of time one has to use extrinsic evidence in order to vacate a judgment. The remainder of paragraph 30 in Scofus provides:
We also think the same rule should be applied to an insane person who seeks to have a divorce decree vacated because the vacation of such decree requires the same personal decision as is required by one seeking a divorce. The divorce decree severs the marital relation and requires a personal decision. The vacation of such decree restores the marriage relation where both parties are living and requires the same exercise of personal decision as is required in deciding that a divorce is desired. An insane person is incapable of making either decision.

Id. ¶30, 280 P.3d at 725. Mrs. Galbraith also cites State ex rel. Robedeaux v. Johnson, wherein, we agreed with the authorities cited by Mrs. Robedeaux that an insane person, under guardianship, cannot maintain an action for divorce. 1966 OK 157, ¶15, 418 P.2d 337, 340.
¶10 In the present case, we disagree with Mrs. Galbraith's reliance upon our decision in Scofus for several reasons. Mrs. Galbraith argued in her motion to dismiss that under Oklahoma law, a mentally incompetent person cannot institute a divorce action through a guardian, citing Scofus. However, Scofus only addressed whether an "insane" person would be prevented from filing for divorce through their guardian. Nothing in the record before this Court indicates Mr. Galbraith was ever adjudicated "insane." The record refers to him as incapacitated[6], however, there is no order included in the record even making this adjudication.
¶11 Mrs. Galbraith also asserted that the decision to end a marriage is purely a personal decision and if a guardian could initiate a divorce proceeding on behalf of a ward, he or she could also enter into a marriage on behalf of a ward. We find this concern unfounded. Section 1 of title 43 of the Oklahoma Statutes provides:
Marriage is a personal relation arising out of a civil contract to which the consent of parties legally competent of contracting and of entering into it is necessary, and the marriage relation shall only be entered into, maintained or abrogated as provided by law.
This statute provides that marriage is a civil contract and is personal, thereby requiring the consent of both parties as well as requiring those parties to be legally competent to enter into a contract. No statute granting a similar level of personal status for a dissolution of marriage has been cited. Mrs. Galbraith mainly relies upon the dicta expressed in Scofus and interprets this language to apply the same level of personal gravitas of marriage to an action for dissolution of marriage. In as much as Scofus can be interpreted to require this, we disagree with the opinion, especially considering the facts of this case and the subsequently enacted legislation.
¶12 Marriage requires the consent of both parties as well as requires those parties to be competent to contract. A marriage binds the married couple to a contract which confers special rights and responsibilities and creates a marital estate. Unlike marriage, a divorce need only be initiated by one party. Therefore, when proceedings are initiated by the other spouse, one is compelled to dissolve their marriage even when it is not desired. The purpose of the divorce is to end the legal status of the relationship and to equitably divide the marital estate as well as to provide for support, including support for the care and custody of any children of the marriage. In other words, divorce proceedings entail the division of assets, the calculation of support and the termination of any special rights granted by the marriage. Feelings set aside, it is a contract dispute that will inevitably end in the termination of the contract. A divorce clearly lacks the same level of "personal" status as that given to marriage.
¶13 Decades after Scofus and Robedeaux the Legislature enacted the Oklahoma Guardianship and Conservatorship Act (OGCA).[7] The purpose of the OGCA includes providing protection for the rights of incapacitated persons and the management of their financial resources. 30 O.S. 2021, § 1-103 (A). The act identifies the various duties of the guardian. Guardians are required to "assure, to the extent reasonably possible, that the rights of the wards for whom they are appointed are protected." Id. § 1-103(B)(2)(a). A guardian "has only those powers over the person or the property of the ward, or both such person and property, as ordered by the court pursuant to this title." Id. § 1-119 (emphasis added). A "guardian . . . must look to the support, health and education of the ward." Id. § 1-120(A). A "guardian of the property must keep safely the property of his ward." Id. § 1-121(A). A "guardian of the property . . . shall act as a fiduciary and shall perform, diligently and in good faith, as a prudent person would in managing his own property, not with regard to speculation but with regard to conservation and growth, and the specific duties and powers assigned by the court." Id. (B) (emphasis added). A "guardian . . . of the person of an incapacitated . . . person is responsible for the care or control of the ward pursuant to the [Act], and the orders of the court . . . ." Id. § 3-118(A)(emphasis added). A "guardian . . . of the person of an incapacitated . . . person shall: . . . . c. provide any required consents or approvals on behalf of the ward as authorized by the court." Id. (B)(1)(c)(emphasis added).
¶14 In addition, the OGCA grants certain authority to the courts. It provides:
B. It is the purpose of the system of general and limited guardianships for incapacitated and partially incapacitated persons established by this act to provide for the participation of such persons, as fully as possible, in the decisions which affect them. It is the intent of the Oklahoma State Legislature:

1. That the court shall exercise the authority conferred by the Oklahoma Guardianship Act so as to encourage the development of maximum self-reliance and independence of the incapacitated or partially incapacitated person and make appointive and other orders only to the extent necessitated by the mental and adaptive limitations or other condition of the incapacitated or partially incapacitated person warranting the procedure;

30 O.S. 2021, § 1-103(B)(1). Section 1-114 of title 30 provides in pertinent part (emphasis added):
A. In all cases the court making the appointment of a guardian has exclusive jurisdiction to control such guardian in the management and disposition of the person and property of the ward.
B. The court has jurisdiction over guardianship proceedings, and has the following powers, which must be exercised in the manner prescribed by statute, to:

1. Appoint and remove guardians for minors and for incapacitated and partially incapacitated persons;
2. Issue and revoke letters of guardianship;
3. Control the conduct of guardians with regard to the care and treatment provided to their wards;
4. Control the conduct of guardians with regard to the management of the financial resources of their wards, including but not limited to the power to:

a. compel guardians to submit plans, reports, inventories and accountings to the court,
b. compel payment and delivery by guardians of property belonging to their wards,
c. order the payment of debts, the sale of property, and order and regulate the distribution of property which has been placed under the control or management of a guardian, and
d. settle the accounts of guardians;
5. Appoint appraisers of the property of wards;
6. Compel the attendance of witnesses and the production of documents and property;
7. After a petition has been filed for appointment of a guardian for a minor, make or modify any temporary order of guardianship during the progress of the proceedings that would be in the best interest of the ward. Any such temporary order may be entered ex parte with written notice sent to all parties directing them to appear before the court, at a time and place therein specified, not more than twenty (20) days from the time of making such order, to show cause why the order should not be granted for temporary guardianship; and

8. Exercise all powers conferred by the Oklahoma Guardianship and Conservatorship Act, Section 1-101 et seq. of this title, and to make such orders as may be necessary for the exercise of said powers. 

¶15 When the Act was created in 1988, it amended existing law and enacted new sections of law. In particular, it enacted a new section of law, 30 O.S. § 3-119. The version applicable to the present matter is the current version of the statute (30 O.S. 2021, § 3-119). This section provides certain limitations on the powers of a guardian. It begins by stating "A guardian shall have no powers except as provided by the Oklahoma Statutes or given to such guardian in the orders in the guardianship proceeding." (emphasis added). It then provides a non-exhaustive list of limitations and restrictions on the guardian and the courts. This includes provisions to: a) limit a guardian's ability to withhold life-sustaining procedures from the ward without specific authorization from the court; b) prohibit both the guardian and courts from consenting to the termination of a ward's parental rights; c) prohibit a guardian from consenting to certain medical procedures without specific authorization from the court; d) prevent a guardian from prohibiting a marriage or divorce of the ward without specific authorization from the court; and e) restrict a guardian from committing a ward to a facility absent formal commitment proceedings that include independent counsel for the ward.
¶16 If the legislative intent cannot be ascertained from the language of a statute, as in the cases of ambiguity, we must apply rules of statutory construction. YDF, Inc. v. Schlumar, Inc., 2006 OK 32, ¶6, 136 P.3d 656, 658. The test for ambiguity in a statute is whether the statutory language is susceptible to more than one reasonable interpretation. In Matter of J.L.M., 2005 OK 15, ¶5, 109 P.3d 336, 338. The legislative intent will be ascertained from the whole act in light of its general purpose and objective considering relevant provisions together to give full force and effect to each. State ex rel. Dept. of Human Services v. Colclazier, 1997 OK 134, ¶9, 950 P.2d 824, 827; Keating v. Edmondson, 2001 OK 110, ¶8, 37 P.3d 882, 886. This Court will not limit consideration to one word or phrase but will consider the various provisions of the relevant legislative scheme to ascertain and give effect to the legislative intent and the public policy underlying the intent. YDF, Inc., 2006 OK 32, ¶6, 136 P.3d 656, 658.
¶17 The question presented to this Court is whether the OGCA provides a court the authority to grant a guardian the power to initiate a divorce proceeding on behalf of the ward. We answer in the affirmative. In our review of the whole Act, the OGCA repeatedly emphasizes the court's authorization to grant powers to the guardian. It is clear from the purpose of the OGCA, the Legislature intended to provide authorization for a guardian to protect the rights of the ward as well as provide for the management of the ward's financial resources. Section 3-119 provides a list of powers that a guardian is prohibited from doing without court approval, in most cases. It is significant to this Court's review of legislative intent that the Legislature did not prohibit a court from authorizing a guardian to initiate a divorce proceeding on behalf of the ward. Especially, when, as here, the main if not sole reason for filing the petition for dissolution of marriage complies with one of the fundamental purposes of the Act, i.e., to protect the (growth) and management of the ward's financial resources. The guardian acts as a fiduciary of the ward's resources and here the guardian filed the petition for divorce after having been authorized to do so by the guardianship court.
¶18 All that remains of the marriage is a determination as to the equitable division of property. This division will include the review of the parties' antenuptial agreement which the parties agree provides that it will terminate in 10 years unless a petition for divorce is filed prior to the date of termination of the agreement. The guardian is protecting the rights and resources of the ward by initiating a proceeding that will effect the terms of the antenuptial agreement. Some arguments were made that these asset issues could all be handled within the guardianship proceedings without the need to file for divorce. The guardianship proceedings are not before this Court as there is no evidence that an appeal was taken from any of the guardianship court orders. The trial court's judgment dismissing the petition prevents the ward and guardian from initiating a proceeding necessary to enforce the ward's access to the courts. Mr. Galbraith and his guardian are being denied access to the courts to enforce an agreement which is asserted would provide more support for the ward.[8] A denial which goes against the very purpose of the OGCA.[9] 

¶19 Mrs. Galbraith also cited 43 O.S. 2021, § 105(C), as another reason why a court cannot authorize a guardian to initiate a divorce proceeding. Subsection C of section 105 states that a "petition [for dissolution of marriage] must be verified as true, by the affidavit of the petitioner." Here, the petition for dissolution of marriage filed by the guardian states "the Petitioner, Peter Galbraith, II, by and through his Guardian of Person and Property, Mark Galbraith" and then the verification states that "I am acting on behalf of the Petitioner" and is signed by "Mark Galbraith" as "Guardian of the Person and Property [of] Peter Galbraith, II." In light of the provisions of the OGCA, we do not see the language in subsection C to be a bar against a guardian's verification of the petition. As mentioned, many parts of the OGCA expressly allow a court to grant powers to the guardian, e.g., § 3-119(A) provides the guardian with powers as ordered by the court in the guardianship proceedings. The guardianship court provided in its August 8, 2023, Amended Order that "the Court hereby grants the General Guardian authorization to pursue any and all legal actions . . . inclusive of instituting an action for a Dissolution of Marriage and obtaining a Final Decree of Dissolution of Marriage." We find this authorization would necessarily include all powers required to effectuate the filing of the petition. Further, subparagraph c of paragraph 1 of subsection B of section 3-118 provides:

B. 1. A guardian or limited guardian of the person of an incapacitated or partially incapacitated person shall:
. . . .

c. provide any required consents or approvals on behalf of the ward as authorized by the court.

30 O.S. 2021, § 3-118(B)(1)(c). The court clearly provided authorization for the guardian to file the petition and thus any consents or approvals necessary to do that were also authorized.[10] 

CONCLUSION

¶20 The trial court's judgment specifically dismissed Mr. Galbraith's petition for dissolution of marriage based upon its interpretation of our decision in Scofus v. Fuller, 43 O.S. § 105(C), and 30 O.S. § 3-119. The Scofus decision concerned a ward who had been adjudicated "insane" after a decree of divorce and was decided on issues related to the vacation of a judgment. Neither fact or issue is present in this case. The Scofus dicta also spoke to the personal nature of divorce and determined a guardian could not initiate a divorce action on behalf of an "insane" ward. For the foregoing reasons, we disagree with its dicta in as much as it may be interpreted to prevent all divorce actions from being initiated by a guardian on behalf of a ward. The contention that a divorce action is of such a personal nature to be on the same level as that of marriage and therefore can only be initiated by the ward, is not well taken. There are ample provisions in the Oklahoma Guardianship and Conservatorship Act to support the authority of a court to grant powers to a guardian. We hold, that under the facts of this case, the Oklahoma Guardianship and Conservatorship Act does not explicitly disallow the Guardianship court from authorizing the filing of a petition for a divorce to "protect the rights of the ward" and for the "support, health and education of the ward." These powers can include the authority of the guardian to initiate a divorce action on behalf of the ward. This is especially true here when reading those provisions in conjunction with the purpose of the OGCA. We also hold the addressed provisions of title 43 of the Oklahoma Statutes do not act as a bar to the initiation of such an action by the guardian. The dispositive issue is whether the guardianship court may authorize a guardian to initiate a divorce action on behalf of a ward. We hold that such authorization is within the powers granted to the court by law. We reverse the trial court's judgment granting Mrs. Galbraith's motion to dismiss and remand the matter for further proceedings.

PREVIOUSLY RETAINED ON THIS COURT'S OWN MOTION; JUDGMENT OF THE TRIAL COURT REVERSED; 
REMANDED FOR FURTHER PROCEEDINGS
Rowe, V.C.J., Kauger, Edmondson, Combs and Darby (by separate writing), JJ., concur;
Kane, C.J. (by separate writing), Winchester (by separate writing), Gurich and Kuehn (by separate writing), JJ., dissent.

FOOTNOTES
[1] In 1988 extensive legislation amended law as well as added new law to create the Oklahoma Guardianship Act. 1988 Okla.Sess.Laws ch. 329, H.B. 1078 (1988). In 1990, H.B. 2176 amended title 30 O.S. § 1-101 to rename the Act the Oklahoma Guardianship and Conservatorship Act. 1990 Okla.Sess.Laws ch. 323, § 1 (1990).
[2] Justice Winchester's dissenting opinion alludes to some provisions of the antenuptial agreement. However, the antenuptial agreement was not made part of the record and its specific provisions, other than the conditions upon which it shall expire, are not before this Court. 
[3] A general guardian "is a guardian of the person or of all the property of the ward within this state or of both such person and property." 30 O.S. 2021, § 1-109 (A). Here, the guardianship is over both the person and property of Mr. Galbraith.
[4] Concerning the guardianship action, the record on appeal only contains the application and order related to the granting of authority for the guardian to file legal action, the amended order to specifically allow the guardian to institute an action for dissolution of marriage, and the order to seal these guardianship documents. The Respondent asserts that the hearing to determine whether the guardian could institute the dissolution of marriage was done ex parte. Chief Justice Kane's dissent also makes assertions concerning what notice the respondent had of various guardianship proceedings and what notice would have been appropriate. Our record does not include any other documentation from the guardianship proceedings, nor does it support what notice the respondent received for any of the guardianship proceedings. The briefs also do not contain supporting argument and authority as to what notice would have been appropriate. Further, there is no evidence in this record that any order in the guardianship case was ever appealed.
[5] ROA, Tab 9, Trans. Oct. 31, 2023, at 17.
[6] 30 O.S. 2021, § 1-111 (12) defines "incapacitated person" as follows:
12. "Incapacitated person" means a person eighteen (18) years of age or older:
a. who is impaired by reason of:
(1) mental illness as defined by Section 1-103 of Title 43A of the Oklahoma Statutes,
(2) intellectual or developmental disability as defined by Section 1430.2 of Title 10 of the Oklahoma Statutes,
(3) physical illness or disability,
(4) drug or alcohol dependency as defined by Section 3-403 of Title 43A of the Oklahoma Statutes, or
(5) such other similar cause, and
b. whose ability to receive and evaluate information effectively or to make and to communicate responsible decisions is impaired to such an extent that the person:
(1) lacks the capacity to meet essential requirements for physical health or safety, or
(2) is unable to manage financial resources.
Whenever in the Oklahoma Statutes the term "incompetent person" appears and refers to a person who has been found by a district court to be an incompetent person because of an impairment or condition described in this paragraph it shall have the same meaning as "incapacitated person" but shall not include a person who is a partially incapacitated person;
[7] See supra note 1.
[8] See Art. II, § 6, Okla. Const.
[9] Mrs. Galbraith raised other issues at the trial court that were not addressed in its December 6, 2023, judgment. First, she cited 43 O.S. 2021, § 3, as additional evidence that marriage is a "personal relation" requiring the consent of the parties. This section of law is not applicable to the present case. It merely provides the minimum age to consent to marry and provides some exceptions for underage marriages as well as prohibits incestuous marriages. It adds nothing to dissuade us from our holding that divorce does not rise to the same personal level as marriage when answering the question of whether a guardian may initiate a divorce proceeding on behalf of a ward. Second, she argued to the trial court that the petitioner was forever barred by issue and claim preclusion from bringing this second divorce action because the trial court previously ruled, in the first divorce action, that he lacked authority to do so. Although the trial court, at the May 24, 2023 hearing, stated that "if a guardian cannot have the power to prohibit a divorce, this Court cannot find they have the power to initiate a divorce. There's no legal mechanism or statutory authority for that in the state of Oklahoma," the written judgment, merely held that co-guardians lacked authority to initiate the divorce proceeding. As mentioned, following this first judgment, Mark Galbraith was granted the authority to initiate the second divorce proceeding by the guardianship court in its amended order dated August 8, 2023. The appealed December 6, 2023, second divorce judgment made no ruling concerning issue or claim preclusion. It provided more specific reasons not mentioned in the first judgment for its holding that the guardian lacked authority to initiate the divorce proceeding. Neither issue was presented in appellant's petition in error and appellee did not file a counter petition in error asserting any error in the judgment.
[10] Although having no precedential value, it should be noted that the Petitioner provided several examples of cases in Tulsa County, Oklahoma, where guardians have verified petitions for the dissolution of marriage of the ward (See FD-2014-3088 and FD-2016-93; Dist. Crt. for Tulsa County, State of Oklahoma).

DARBY, J., concurring specially :
¶1 I concur in the majority opinion because the Court upholds the jurisdiction and statutory discretion given to the judge presiding over the guardianship case to enter an order upon request giving authority to the co-guardians to file a divorce action on behalf of the ward. Plus, today's holding is limited to the issue of what the guardianship court has the discretion to do, or not do, regarding such a request. We are not reviewing for abuse of discretion. Today's ruling is not precedent requiring every guardianship court to grant every guardian's request for an order authorizing them to file for divorce on behalf of their ward.
¶2 I must add, however, the judge in the divorce court had no jurisdiction or authority to sit in appellate review of the action of the guardianship judge. The guardianship court has exclusive and continuing jurisdiction to appoint a guardian and to preside over the proceeding until it is terminated by the court, or the order expires by its own terms. 30 O.S.2011, §§ 3-308 & 3-310. Wife could only properly challenge the guardianship court's authority to enter the order in an appeal in the guardianship case to this court, not the judge across the hall in Tulsa County.

KANE, C.J., dissenting: 
¶1 Marriage is more than a merger of assets between consenting adults- it is a personal relationship and commitment. The majority today points to portions of the record that suggest that the ward might financially benefit from a divorce, even though someone other than the ward is making the election to end the personal relationship. Because neither existing case law nor our statutes provide such a remedy in any circumstance, I decline to engage in an analysis of the virtue or fault of either party.
¶2 The majority elects to judicially cast Oklahoma into the minority of States wherein a guardian is entitled to petition divorce for his/her ward. While this reading is contrary to existing statute and case law, I write primarily to focus on how that this unwarranted reading of the guardianship code is inconsistent with other provisions of the code, and violates basic due process.
¶3 Spouses of wards hold a unique position with special rights under Oklahoma guardianship law. For instance, spouses have priority to serve as guardian, even over adult children and parents (see 30 O.S., § 3-104); the spouse of a married incapacitated or partially incapacitated person may nominate by will, or by other writing executed by the nominating spouse an individual to serve as guardian or limited guardian upon the death or incapacity of the nominator (see 30 O.S., § 3-103); the spouse is the very first family member enumerated by the legislature to receive notice of hearing of a guardianship petition (see 30 O.S., § 3-110); the spouse is entitled to notice of any hearing to determine restoration of capacity (see 30 O.S., § 3-116); and the spouse is entitled to a copy of the guardian's annual report (see 30 O.S., § 4-307). Tellingly and perhaps most importantly, the spouse is entitled to notice and opportunity to be heard in the event of any formulation or change of the guardianship plan. 30 O.S. § 3-113(D). Do we seriously believe that the spouse should be heard before the ward's meal plans are restructured, but have no say in whether a dissolution of the marriage is appropriate?
¶4 There is no doubt - a spouse is entitled to be fully informed of all aspects of his/her spouse's guardianship proceeding. Any ex parte proceeding that inures to the detriment of a spouse begs for a consideration of due process. Therein lies the problem with efforts to fashion equity beyond the strictures of the statutes: such a task would require a good deal more legislating than the majority has already undertaken.
¶5 In family law, our legislature has devoted a considerable amount of attention to procedural safeguards where ex parte relief is sought.[1] In fact, there are emergency provisions for ex parte relief in the Guardianship Act as well. However, the only ex parte 'emergency' relief contemplated by the Act as to adult wards seems to be for the appointment of a special guardian temporarily without initial notice, but with the parties (including the spouse) to be heard from before a final order is entered. See 30 O.S., § 3-115.
¶6 There is nothing in the record to suggest that the guardianship court in this case held to even that process in the present case. Why? Because this was not a special guardianship, and there is simply nothing in existing law that remotely contemplates that a guardian can (or should) seek a divorce on behalf of the ward. Once the majority has dipped our toe into the water of legislating such a result, logic compels us to continue the legislative task of adding more to the guardianship code to spell out how this task might be accomplished without violating due process of law. The fact that procedures for such an undertaking would need to be cobbled together is additional confirmation that we have overstepped our bounds.
¶7 Until the legislature determines that we should join the minority of States that legislate the ability of guardians to sue for divorce on behalf of their wards, it is simply not the law in this State. See Scoufos v. Fuller, 1954 OK 363, ¶ 30, 280 P.2d 720, 725; State ex rel. Robedeaux v. Johnson, 1966 OK 157, ¶ 15, 418 P.2d 337, 340.
¶8 My reading of the current guardianship code is that suing for divorce is not a specifically enumerated power of the guardian because the legislature recognized the reality that marriages need to be more than a mere calculation of what is financially savvy for each individual spouse. We cheapen that reality today by deciding that we know better than our sister branch of government, trammeling due process along the way. I respectfully dissent.

FOOTNOTES
[1] A non-exhaustive list of examples include procedures to follow in emergency ex parte protective orders: taking children into emergency state custody, 22 O.S., § 60.3, 22 O.S., § 60.4, 22 O.S., § 60.5, and 22 O.S., § 60.6; taking children into emergency medical custody, 10A O.S., § 1-4-201 and 10A O.S., § 2-2-101; emergency jurisdiction under the UCCJEA, 43 O.S., § 551-204; and motion of emergency custody hearing, 43 O.S., § 107.4.

Winchester, J., with whom Kane, C.J., and Gurich, J. join, dissenting:
¶1 The Court allows the guardian of Peter Towne Galbraith, II (Galbraith) to file for divorce for the main purpose of enforcing an antenuptial agreement prior to its expiration.[1] The majority concludes that filing for divorce is warranted in this matter to protect the growth and management of Galbraith's finances. Galbraith's guardian points to three reasons for seeking a divorce: Belinda Galbraith (Wife) chose not to be Galbraith's guardian, Galbraith moved out of the house he lived in with Wife to move into an assisted care facility, and suggesting Wife improperly transferred the house to her trust. These three allegations should not allow the guardian to step into the shoes of Galbraith to end his nearly ten-year marriage, and thereby severing the parties' rights under the antenuptial agreement if they remain married. Today's decision goes against the weight of authority in Oklahoma and elsewhere, authorizing a guardian to make a purely personal decision on behalf of an incapacitated ward. The Court allows a guardian to do so without any specific Legislative authority. Even more problematic are the practical implications of the majority's blanket grant of authority.
¶2 The Oklahoma Guardianship and Conservatorship Act (Act) does not allow for a guardian to initiate a divorce proceeding on behalf of the ward. The Act is clear in the power it gives a guardian on behalf of a ward regarding marriage or divorce. It states:
A guardian shall have no powers except as provided by the Oklahoma Statutes or given to such guardian in the orders in the guardianship proceeding. This limitation of powers includes but is not limited to the following:
* * *
4. No guardian shall have the power to prohibit the marriage or divorce of a ward except with specific authorization of the court having jurisdiction of the guardianship proceeding[.]
30 O.S.2021, § 3-119.
¶3 Statutory language is given its "plain and ordinary meaning unless it is contrary to the purpose and intent of the statute when considered as a whole." Stump v. Cheek, 2007 OK 97, ¶ 9, 179 P.3d 606, 611. Where the "language is plain and clearly expresses the legislative will, further inquiry is unnecessary." Cattlemen's Steakhouse, Inc. v. Waldenville, 2013 OK 95, ¶ 14, 318 P.3d 1105, 1110. I disagree with the majority that the language of the Act is ambiguous. The Legislature plainly gave power to the guardian to consent to a marriage or divorce brought by a spouse of a ward.[2] However, the Legislature omitted any grant of authority to a guardian to initiate the divorce on behalf of the ward, which is in line with our Court's prior holdings.
¶4 Prior to the enactment of the Act, our Court held that a guardian cannot institute a divorce on behalf of an incompetent ward. Specifically, in Scoufos v. Fuller, the Court stated:
We think the majority rule that an insane person may not institute or maintain a divorce action by guardian or Committee, is sound and fair. We also think the same rule should be applied to an insane person who seeks to have a divorce decree vacated because the vacation of such decree requires the same personal decision as is required by one seeking a divorce. The divorce decree severs the marital relation and requires a personal decision. The vacation of such decree restores the marriage relation where both parties are living and requires the same exercise of personal decision as is required in deciding that a divorce is desired. An insane person is incapable of making either decision.
1954 OK 363, ¶ 30, 280 P.2d 720, 725.
¶5 In State ex rel. Robedeaux v. Johnson, we again noted our agreement with the law that an insane person, under guardianship, cannot maintain an action for divorce. 1966 OK 157, ¶ 15, 418 P.2d 337, 340. This law is also well established in the United States by the weight of authority.[3] 

¶6 While the majority attempts to categorize these holdings in Scoufos and Robedeaux as dicta, the holdings are in line with other cases decided by our Court wherein we repeatedly found that a guardian cannot take purely personal actions on behalf of the ward. In Hendricks v. Grant County Bank, the Court, in reaching its decision that a guardian could not redeem a certificate of deposit on behalf of the ward, upheld the rule that a guardian is not empowered to act for a ward in matters involving the exercise of personal discretion to alter acts performed by the ward while competent. 1963 OK 50, ¶¶ 18-19, 379 P.2d 693, 697. In In re Delany, we decided that a guardian does not have the power to stipulate on behalf of an incompetent ward to terminate parental rights and again held that a guardian may not make purely personal decisions on behalf of the ward. 1980 OK 140, ¶ 13, 617 P.2d 886, 891. Yet the Court is allowing the guardian in this case to make a purely personal decision on behalf of Galbraith.

¶7 The majority attempts to distinguish Scoufos and Robedeaux from the facts before us by concluding that a court never adjudicated Galbraith "insane." However, whether a ward is adjudicated "insane" is not the standard by which we decide whether a guardian is allowed to initiate a divorce on behalf of a ward. The Robedeaux Court distinguished the ability of a guardian to initiate and maintain a divorce on behalf of a ward who was "insane" or "mentally incompetent" from one who was only incompetent to manage his property. 1966 OK 157, ¶ 16, 418 P.2d at 340. The Court allowed a guardian to maintain a divorce on behalf of a ward with only a guardianship over his estate, noting a clear delineation between a ward who has a general guardianship over his property from a ward who has a guardianship over his person and property. Id.
¶8 Since Scoufos and Robedeaux, the Legislature defined incapacitation to include, among others, those who suffer from mental illness and rejected any difference between insanity and mental illness.
[4] An incapacitated person is generally defined as a person whose ability to evaluate information effectively or make responsible decisions is impaired to such an extent that the person lacks the capacity to meet essential requirements for physical health or safety or is unable to manage financial resources. 30 O.S.2021, § 1-111(12). Here, Galbraith was adjudicated an "incapacitated" person under the law, which now includes any previous reference to "insane" or "insanity." And he has a guardian over his person and property. The holdings in Scoufos and Robedeaux apply to the facts of this case, and the Court should not allow the guardian to initiate a divorce on behalf of Galbraith.
¶9 Even more, the majority's blanket grant of authority to a guardian to file for divorce on behalf of an incapacitated ward is ripe for abuse. Even here, the grant of authority is problematic for many reasons. First, Galbraith's guardian obtained an ex parte order in the guardianship proceeding to allow the guardian to file for divorce without any notice to Wife or her counsel. Wife had no recourse or ability to object to the guardianship court granting the guardian the authority to file for divorce. If Galbraith's guardian had given her notice, Wife could have objected to the divorce in the guardianship proceeding and explained her position as to why a divorce was unnecessary. The Court could have weighed whether Galbraith's assets could meet his financial needs without a divorce and the impact a divorce would have on Wife and Galbraith under their antenuptial agreement. However, there is no evidence that the guardianship court held an evidentiary hearing or that the guardianship court weighed what was in the best interest of Galbraith. The majority's allowance of this authority granted ex parte by the guardianship court affects not only the parties in this case but also spouses and heirs in all other guardianship proceedings.
¶10 Second, Galbraith's guardian contends that Wife's objection to the divorce is only for her to obtain an inequitable distribution of property upon Galbraith's death to which she would not otherwise have rights. The Act directs a guardian to manage the ward's funds in such a manner that the ward is properly provided for and the financial resources of the ward are prudently managed. See 30 O.S.2021, § 3-121(A)(1). However, prudent management should not be considered synonymous with conserving financial resources for the benefit of the heirs of an incapacitated person, which seems from the record to be the main objective of Galbraith's guardian to file for divorce.[5] The distribution of property upon Galbraith's death is not relevant to the current management of his financial resources, making a divorce unnecessary. The guardianship court should manage the financial resources of Galbraith for his treatment. Nevertheless, the majority concludes that filing for divorce is warranted to protect the growth and management of Galbraith's financial resources, without the guardian showing additional financial need in this case to warrant a divorce.
¶11 Finally, the majority ignores the contractual right that Wife has in the antenuptial agreement. Under Oklahoma law, antenuptial agreements are favored. Leonard v. Prentice, 1935 OK 427, ¶ 17, 43 P.2d 776, 780. The enforceability of any antenuptial contract depends on its own language and the particular facts and circumstances surrounding it. As in other contract cases, the object is to follow the intent of the parties. In re Cole's Estate, 1922 OK 51, 205 P. 172, 178. The antenuptial agreement lists separate property for both Galbraith and Wife. If Wife remains married to Galbraith for at least one more year, the antenuptial agreement expires, and both parties are seemingly entitled to each other's separate property, not just Wife. By this Court granting the power to file a divorce action, Galbraith's guardian is severing any rights Wife and Galbraith may have if the marriage continues and ignoring the intent of the parties to the agreement. More importantly, Wife has no recourse.
¶12 As set forth above, the grant of the authority to Galbraith's guardian to file for divorce on behalf of an incapacitated ward is not only legally erroneous but also practically problematic. The dissolution of marriage by an outside third party, the guardian in this case, undermines Oklahoma's public policy that marriage is personal and can only be severed by the parties. The decision today weaponizes a guardianship to allow for divorce without consent of a ward. For these reasons, I dissent to allowing Galbraith's guardian to file for divorce. Instead, the issues with Galbraith's assets and financial resources should be handled within the guardianship proceeding without the need to file for divorce.

FOOTNOTES
[1] Galbraith's guardian filed the Antenuptial Agreement as part of his Petition for Dissolution of Marriage in Tulsa County District Court, Case No. FD-2023-49. We take judicial notice of the agreement. See Green v. Mac's Plating Works, 1977 OK 71, ¶ 21, 563 P.2d 148, 152 ("The court takes notice of judgment, decrees, records and proceedings pending, and will notice particularly former proceedings to which reference is made in a pending cause.").
[2] See Teresa Collett, Keeping my Brother's Keeper: An Introduction to Article III of the Oklahoma Guardianship Act, 42 Okla. Rev. 243, 271 (1989) (discussing how "this limitation is expressed in terms of prohibiting the marriage or divorce of a ward," and the commentary to a similar provision of the ABA Model Guardianship and Conservatorship Act "suggests that this 'prohibition' language is intended to implicitly grant a guardian of the person the power to consent to a divorce.").
[3] See, e.g., Jackson v. Bowman, 294 S.W.2d 344 (Ark. 1956); Cox v. Armstrong, 221 P.2d 371 (Colo. 1950); Phillips v. Phillips, 45 S.E.2d 621 (Ga. 1947); State ex rel. Quear v. Madison Cir. Ct., 99 N.E.2d 254 (Ind. 1951); Mohler v. Shank's Estate, 61 N.W. 981 (Iowa 1895); Birdzell v. Birdzell, 6 P. 561 (Kan. 1885); Stevens v. Stevens, 254 N.W. 162 (Mich. 1934); Freeman v. Freeman, 237 S.E.2d 857 (N.C. Ct. App. 1977); Mallory v. Mallory, 450 N.Y.S.2d 272 (N.Y. 1982); Mohrmann v. Kob, 51 N.E.2d 921 (N.Y. 1943). See also David E. Rigney, Annotation, Power of Incompetent Spouse's Guardian, Committee, or Next Friend to Sue for Granting or Vacation of Divorce or Annulment of Marriage, 6 A.L.R.5th 673 (1995).
[4] Title 30, section 1-111(12) states that an "incapacitated person" is impaired by reason of mental illness, intellectual or developmental disability, physical illness or disability, drug or alcohol dependency, or such other similar cause, and whose ability to receive and evaluate information effectively or to make and to communicate responsible decisions is impaired to such an extent that the person lacks the capacity to meet essential requirements for physical health or safety, or is unable to manage financial resources. 30 O.S.2021, § 1-111(12). In defining mental illness, the Legislature specifically noted that whenever the words "insane" and "insanity" are used, such terms have equal significance to the words "mental illness," which is defined as a substantial disorder of thought, mood, perception, psychological orientation or memory that significantly impairs judgment, behavior, capacity to recognize reality or ability to meet the ordinary demands of life. See 43A O.S.2021, 1-103(3) & (10).
[5] See Teresa Collett, Keeping my Brother's Keeper: An Introduction to Article III of the Oklahoma Guardianship Act, 42 Okla. Rev. 243, 271 (1989) (discussing the ABA Model Guardianship and Conservatorship Act's commentary related to a guardian's duties to manage the ward's finances in the Act).

KUEHN, J., dissenting:
¶1 The Oklahoma Guardianship and Conservatorship Act Title 30 § 3-119 provisions on marriage and divorce are significant. It clearly states that a guardian's ward is not allowed to prohibit marriage or divorce. The term 'prohibit' here refers to a situation where a ward has agreed, in some capacity, to become married or to seek a divorce before becoming incapacitated. This makes complete sense. For example, a woman is married and files for a divorce. Soon after filing for divorce, she becomes incapacitated. Knowing that he can reap more inheritance if he is not divorced, her husband becomes guardian over his wife, now ward. He prohibits the divorce from going forward on behalf of his ward. He can even dismiss it. The legislature enacted the provision to stop this example from happening. Brilliant! Of course, this is the law because before she became incompetent, her filing for a divorce made her free will to divorce her husband clear to all. Her decision to divorce does not change because she can no longer communicate. Her decision cannot be inhibited now; by no fault of her own, she cannot carry out her wish to divorce.
¶2 The Majority focuses on the limited facts of this case. They are wealthy and have a prenuptial agreement.[1] She moved her own home into a trust after her husband was incapacitated, and so on. But none of this matters.
¶3 We want to swoop in and make everything "fair" because the legislature has not solved what the Court presumes is a problem. A court only looks to limited facts that do not matter for statutory interpretation to justify a result. Here, the Majority pulls on heartstrings by concluding that not allowing for a divorce is not fair. Relying on a very sparse record, and without knowing what formed the basis for the guardianship court's decision, the Majority emphasizes the need to protect Mr. Galbraith's financial resources. The Majority assumes that these will be protected if a divorce proceeding during the first ten years of marriage ensures the prenuptial agreement remains in effect. In fact, the Majority appears to assume that the marriage has effectively ended with Mr. Galbraith's worsened condition, stating "all that remains of the marriage is a determination as to the equitable division of property". And, combining these assumptions with speculation, the Majority states that the divorce petition is necessary to enforce Mr. Galbraith's access to the courts in order to provide him more financial support. Contemplating these assumptions to make this legal decision is unnecessary and leads to the judge-made law based on a court's wish to make the statute into something it is not. Not to mention, these assumptions could be incorrect.
¶4 The law does not contemplate a guardian helping along a divorce for a ward to manipulate what does not seem like a fair flow of money between spouses. The protections are there for Mr. Galbraith. Nothing in the appellate record shows that Mr. Galbraith's treatment could not continue because of Mrs. Galbraith's misuse of the marital money and a lack of funds to continue his care, or fraud and misuse of the funds to the detriment of the ward. There was no testimony to the guardianship judge that Mrs. Galbraith wanted to be the guardian to give Mr. Galbraith the cheapest care possible or to deny him treatment to save her money. Indeed, she gave up the right to control the type of care and the amount to be spent on that care. Mr. Galbraith can continue to receive the care he needs and deserves under the close watch of his guardians and the guardianship judge. He will also remain married.
¶5 If the legislature sees fit, it can amend the statute. It could consider making a narrow exception for a guardian to file on behalf of a ward who could still testify on his or her behalf as a "highly functioning" ward. It could also explore the option of an exception if the guardian can prove that before incapacitation, the ward planned on filing or wanted a divorce. These amendments could provide a more nuanced approach, considering each case's unique circumstances and the ward's best interests.[2] 

¶6 Mr. Galbraith, if he was able, might be appalled at learning he was divorcing his wife. He could believe that just because he tragically contracted a disease does not mean he does not love his wife and wants to be single. It does not matter what this Court could assume or even know to be true. The statute does not allow for a third party to petition for divorce.

¶7 I dissent to reading into the statute a legal right that does not exist.

FOOTNOTES
[1] The prenuptial agreement was not included in the record for this appeal. Justice Winchester's separate writing takes judicial notice of the prenuptial agreement which was admitted into the record in the divorce proceeding at the District Court. I do not agree that any of these facts should be mentioned or are relevant to our interpretation of the statute in this case.
[2] A few States have passed legislation to now allow for guardian initiated divorces: Colorado, Missouri, and Florida. See Colo. Rev. Stat. Ann. § 15-14-102 (West), Mo. Ann. Stat. § 452.314 (West 1990), Fla. Stat. Ann. § 744.3725 (West 1989).
 

 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Supreme Court Cases

 
Cite
Name
Level

 
1954 OK 363, 280 P.2d 720, 
SCOUFOS v. FULLER
Discussed at Length

 
2001 OK 110, 37 P.3d 882, 72 OBJ 3672, 
KEATING v. EDMONDSON
Discussed

 
1935 OK 427, 43 P.2d 776, 171 Okla. 522, 
LEONARD v. PRENTICE
Discussed

 
1922 OK 51, 205 P. 172, 85 Okla. 69, 
PENCE v. COLE
Discussed

 
1963 OK 50, 379 P.2d 693, 
HENDRICKS v. GRANT COUNTY BANK
Discussed

 
1966 OK 157, 418 P.2d 337, 
STATE v. JOHNSON
Discussed at Length

 
2005 OK 15, 109 P.3d 336, 
IN THE MATTER OF J.L.M.
Discussed

 
2006 OK 32, 136 P.3d 656, 
YDF, INC. v. SCHLUMAR, INC.
Discussed at Length

 
2007 OK 97, 179 P.3d 606, 
STUMP v. CHEEK
Discussed

 
2009 OK 65, 222 P.3d 21, 
KIRBY v. JEAN'S PLUMBING HEAT & AIR
Discussed

 
2013 OK 95, 318 P.3d 1105, 
CATTLEMEN'S STEAKHOUSE, INC. v. WALDENVILLE
Discussed

 
1977 OK 71, 563 P.2d 148, 
GREEN v. MAC'S PLATING WORKS
Discussed

 
2016 OK 67, 374 P.3d 766, 
AMERICAN NATURAL RESOURCES, LLC v. EAGLE ROCK ENERGY PARTNERS, L.P.
Discussed

 
2017 OK 34, 394 P.3d 1224, 
OSAGE NATION v. BD. OF COMMISSIONERS OF OSAGE COUNTY and OSAGE NATION v. OSAGE COUNTY BD. OF ADJUSTMENT
Discussed

 
1980 OK 140, 617 P.2d 886, 
Delaney, Matter of
Discussed

 
2020 OK 30, 465 P.3d 1213, 
FARLEY v. CITY OF CLAREMORE
Discussed

 
2022 OK 51, 522 P.3d 473, 
HARWOOD v. ARDAGH GROUP
Discussed

 
2023 OK 14, 524 P.3d 1283, 
MEGEE v. EL PATIO
Discussed

 
1997 OK 134, 950 P.2d 824, 68 OBJ 3526, 
STATE ex rel. DEPT. OF HUMAN SERVICES v. COLCLAZIER
Discussed

Title 12. Civil Procedure

 
Cite
Name
Level

 
12 O.S. 1038, 
Proceedings to Vacate or Modify a Judgment, Decree or Order
Cited

Title 22. Criminal Procedure

 
Cite
Name
Level

 
22 O.S. 60.3, 
Emergency Ex Parte Order - Hearing
Cited

 
22 O.S. 60.4, 
Hearing - Service of Process - Emergency Orders - Protective Orders - Period of Relief - Title to Real Property
Cited

 
22 O.S. 60.5, 
Police to be Sent Copy of Protective Order
Cited

 
22 O.S. 60.6, 
Violation of Protective Order - Penalty
Cited

Title 30. Guardian and Ward

 
Cite
Name
Level

 
30 O.S. 3-308, 
Jurisdiction to Appoint a Guardian or Issue a Protective Order
Cited

 
30 O.S. 1-101, 
Short Title
Cited

 
30 O.S. 1-103, 
Purpose and Intent of Legislature
Discussed

 
30 O.S. 1-109, 
General and Limited Guardian
Cited

 
30 O.S. 1-111, 
Definitions
Discussed at Length

 
30 O.S. 3-103, 
Nomination of Guardian or Limited Guardian by Will for Incapacitated Person
Cited

 
30 O.S. 3-104, 
Priorities for Selection of Guardian or Limited Guardian - Appointment of Organization - Inquiry as to Suitability of Guardian -Appointment of Public Agency
Cited

 
30 O.S. 3-110, 
Notice of Hearing on Petition Requesting Appointment of Guardian for Incapacitated or Partially Incapacitated Person
Cited

 
30 O.S. 3-113, 
Contents of Order Appointing Guardian - Specific Determinations Regarding Capacity - Guardianship Plan
Cited

 
30 O.S. 3-115, 
Appointment of Special Guardian in Certain Instances - Notice - Powers - Duration - Bond - Removal
Cited

 
30 O.S. 3-116, 
Proceedings to Determine Restoration to Capacity
Cited

 
30 O.S. 3-118, 
Duties and Powers of Guardian or Limited Guardian - Diligent and Good Faith Performance of Duties and Powers - Termination of Guardianship
Cited

 
30 O.S. 3-119, 
Powers of Guardian - Limitation of
Discussed at Length

 
30 O.S. 3-121, 
Duty to Keep Property of Ward Safe - Fiduciary Duties
Cited

 
30 O.S. 4-307, 
Mailing of Copies of Annual Report Upon Filing - Hearing - Report Without Notice - Compensation - New Bond - Appointment of Counsel to Represent Ward
Cited

Title 43. Marriage

 
Cite
Name
Level

 
43 O.S. 551-204, 
Temporary Emergency Jurisdiction
Cited

 
43 O.S. 105, 
Petition - Summons
Discussed at Length

 
43 O.S. 3, 
Persons Having Capacity to Marry
Cited

 
43 O.S. 107.4, 
Motion for an Emergency Custody Hearing - Report - Affidavit - Penalties for False Information
Cited

 
 

 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA